DANIEL COKER HORTON & BELL, P.A.

ATTORNEYS AT LAW

4400 Old Canton Road, Suite 400
P.O. Box 1084
Jackson, Mississippi  39215-1084
www.danielcoker.com

STEVEN J. GRIFFIN

sgriffin@danielcoker.com
Telephone: 601-969-7607
Facsimile: 601-969-1116

March 31, 2017

United States Court of Appeals
Office of the Clerk
600 South Maestri Place
New Orleans, LA 70130

> RE:     Case No. 16-60694     *Daniel Kelley v. J. Buscher, et al.*
>                              U.S.D.C. No. 3:14-cv-82-LRA

Dear Members of the Court:

This letter brief is submitted on behalf of Appellees Jerry Buscher, James Alexander and Simone Jones ("Defendants"), in response to the brief of Appellant Daniel Kelley ("Kelley").

## Factual Background and Procedural History

Plaintiff Daniel Kelley filed this *pro se* prisoner action on January 31, 2014, pursuant to 42 U.S.C. § 1983, alleging the violation of his constitutional rights.  ROA.12-22.  At all relevant times, Kelley was a post-conviction inmate in the custody of the Mississippi Department of Corrections ("MDOC") and was housed at the East Mississippi Correctional Facility ("EMCF") in Meridian, Mississippi.  *Id.*  Warden Jerry Buscher, Investigator James Alexander, and Disciplinary Hearing Officer Simone Jones were at all relevant times employed as correctional staff at EMCF.

Kelley's primary complaint is that he received a rule violation report ("RVR") for escaping his housing unit to retrieve contraband, was found guilty, and was assigned to administrative segregation as punishment. An investigation report prepared by James Alexander indicates that at 12:05 a.m. on December 17, 2013, an inmate was observed on the security cameras outside the building on the facility's inner perimeter. ROA.556. Backup was called, and an emergency count was ordered. *Id.* A review of the cameras confirmed the inmate who had been seen walking outside was David Grogan, who was assigned to Unit 1-A. *Id*. When officers reviewed the cameras on Unit 1-A, they observed five inmates climbing down from the roof through the unit's ventilation duct and watched as each inmate returned to his assigned cell. *Id*. Investigators then discovered a hole cut in the tin roof above Unit 1-A, which the inmates had used to escape the unit.  *Id*. They then followed foot prints on the roof to track the path inmates took and found a homemade rope tied to a vent stack the inmates had used to climb down. *Id*. The cameras also showed individuals throwing footballs over the perimeter fence earlier that evening, and the inmates had retrieved them and brought them

DANIEL COKER HORTON & BELL, P.A.

March 31, 2017
Page 2

inside the prison. ROA.557. The footballs were found to contain three pounds of tobacco, four flip-phones and batteries, two chargers, three loose SIM cards, and six black saw-blades. *Id*.

When investigators interviewed Grogan, he identified Kelley – who was also housed on Unit 1-A – as one of the inmates involved in helping recover the contraband. ROA.558. He told investigators that inmate Terrance Stewart climbed down to the ground to retrieve the contraband, while Kelley and inmate Eric Horton waited on the roof. *Id*. Stewart told investigators that he, Kelley, and others were involved in the incident. *Id*. Kelley also admitted to investigators that he and five other inmates had gone through the roof, and that he was to receive one pound of tobacco for his role in helping retrieve the packages. *Id.* Kelley also told investigators that an inmate named "Cat Daddy" had organized the plan. *Id*. Investigators also found that the security cameras on Unit 1-A showed the suspects in question, including Kelley, entering the ventilation duct. ROA.559. The cameras also showed that although Officer Dean and Officer Trayler later came on the unit to conduct count procedures and security checks between 9 p.m. and 11 p.m., they did not go cell to cell pursuant to proper protocol. *Id*. Investigator Alexander noted that if they had done so, they would have discovered that the inmates were not in the unit. ROA.560. The cameras further showed the inmates later re-entering the unit through the ventilation duct. ROA.559. Each of the inmates involved, including Kelley, received RVRs for escaping their housing unit and were placed in segregation pending disciplinary action. ROA.560.

When Kelley signed for receipt of his RVR on December 23, 2013, he marked that he did not request any witnesses, but he did not waive his right to a hearing. ROA.544. Kelley's disciplinary hearing was held on December 30, 2013, at which time he recanted his prior admissions to investigators and denied the allegations against him. *Id*. Lt. Jones ultimately found him guilty and gave him objective reclassification as punishment, which resulted in Kelley being assigned to long-term segregation. ROA.531, 544. Kelley claims Lt. Jones' guilty finding violated his right to due process, alleging that she refused to call witnesses not listed on his RVR (Sgt. Dean and Sgt. Traylor), failed to personally review the camera footage, failed to conduct her own investigation, and failed to tell him the evidence on which she relied in finding him guilty. ROA.18-21.

Kelley further claims Warden Buscher violated his rights by denying his administrative appeal of his RVR conviction. ROA.20-21. Warden Buscher's response to Kelley's disciplinary appeal stated that necessary due process requirements had been met, and no new evidence affecting the hearing officer's guilty finding had been presented. ROA.545-554.

Kelley also claims he was improperly assigned to "long-term segregation" as a result of his RVR conviction. However, as outlined in the affidavit of EMCF case manager Sharon Williams, Kelley was only housed in solitary confinement-type conditions for less than four months, until April 22, 2014. ROA.710-719.

Kelley further asserts that his living conditions while housed in segregation on Unit 6-D and

DANIEL COKER HORTON & BELL, P.A.

March 31, 2017
Page 3

Unit 5-A – where he experienced his most restrictive housing conditions – were constitutionally deficient.[1] He claims his cell did not have a working light until the end of March 2014, which made it more difficult to read and complete his legal work. ROA.90, 534-35. He further alleges that he did not have heat in his cell, causing discomfort from the cold. ROA.90.  He also claims he was only allowed to shower once per week, and that he was not provided out-of-cell recreation. ROA.91-92. He further claims he was subjected to unsanitary conditions during that time, which posed a risk to his health. ROA.92. Kelley charges Warden Buscher with failing to remedy these conditions. ROA.537.

Kelley claims that because he spent several months without a working light in his cell between January and March 2014, he now has problems with his eyesight. He does not claim any other physical injuries as a result of his living conditions. ROA.540. According to his institutional records, Kelley did not raise any concerns about his living conditions on Unit 6-D or Unit 5-A with his case manager or mental health staff during the time period in question. ROA.576-78. Kelley's medical records show that during a routine optometry exam on August 28, 2014, he was diagnosed with hyperopia/presbyopia, or farsightedness. ROA.579-82. This condition is known to present itself around age 40 and is generally caused by age and/or genetics.[2] Kelley was almost 41 years old at the time of his diagnosis.[3] Kelley has failed to present any evidence whatsoever to prove his farsightedness was caused by the temporary lack of a working light in his cell.

On October 8, 2015, Defendants filed a Motion for Summary Judgment as to all claims asserted against them. ROA.523-97. Kelley filed his response on October 27, 2015 (ROA.600-627), and Defendants filed their rebuttal on November 9, 2015 (ROA.634-46). On July 21, 2016, the district court issued an order requesting the parties supplement their briefing to address the length and nature of Kelley's confinement to "long-term segregation" as a result of his RVR conviction for escape. ROA.702-03. Plaintiff filed his supplemental response on September 8, 2016 (ROA.731-78), and Defendants filed their supplemental response on September 14, 2016 (ROA.780-810). On September 28, 2016, the district court issued its order granting Defendants' Motion for Summary Judgment and dismissing each of Kelley's claims with prejudice as a matter of law. ROA.811-823. Kelley timely appealed this ruling. ROA.833.

**Standard of Review**

Summary judgments are reviewed *de novo*.  *See Meditrust Fin. Servs. Corp. v. Sterling*

---

[1] Plaintiff testified that his allegations regarding his living conditions pertain only to his time housed on Unit 6-D and Unit 5-A. ROA.534.

[2] http://www.mayoclinic.org/diseases-conditions/presbyopia/basics/risk-factors/con-20032261

[3] https://www.ms.gov/mdoc/inmate/Search/GetDetails/L2563

DANIEL COKER HORTON & BELL, P.A.

March 31, 2017
Page 4

*Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999). Summary judgment is appropriate where, taking the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### Argument

The district court's *Memorandum Opinion and Order* fully and adequately addresses the claims raised by Kelley in his Complaint and his failure to establish a genuine issue of material fact as to any of his claims against each of these Defendants that would preclude summary judgment in their favor. Defendants adopt and incorporate herein the substance of the district court's *Memorandum Opinion and Order*.

**I.      Kelley has failed to establish a Fourteenth Amendment claim regarding his rule violation conviction and punishment for the same**

Plaintiff's claims regarding his RVR conviction for escaping his housing unit and his resulting reclassification and assignment to "long-term segregation" appear to be asserted under the Due Process Clause of the Fourteenth Amendment. *See Williams v. King*, 2012 U.S. Dist. LEXIS 151288, 3-4 (S.D. Miss. Oct. 22, 2012) (analyzing inmate's challenge to RVR conviction for testing positive to THC under the Due Process Clause).

**A.      Kelley's temporary assignment to segregation does not implicate any protected liberty interest subject to Fourteenth Amendment scrutiny**

To invoke the protections of the Due Process Clause, Plaintiff must have a protected liberty interest at stake. *Williams v. King*, 2012 U.S. Dist. LEXIS 151288, at 3. A constitutionally-protected liberty interest is "limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

A prisoner generally has no protected liberty interest in his security classification, and he has no right to facility privileges. *Wilkerson v. Stalder*, 329 F.3d 431, 435-36 (5th Cir. 2003) (stating that the Fifth Circuit "has continued to hold post-*Sandin* that an inmate has no protectable liberty interest in his classification"). It is also well-settled that assignment to administrative segregation generally is not considered an "atypical and significant hardship" on prisoners. *Pichardo v. Kinker*, 73 F.3d 612, 613 (5th Cir. 1996). "[A]bsent extraordinary circumstances, administrative segregation as such, being an incident to the ordinary life as a prisoner, will never be a ground for a constitutional claim." *Id.*, at 612; *see also Nathan v. Hancock*, 477 F. App'x 197, at *1 (5th Cir. 2012) (holding "a prisoner's change in custody status, including his placement in disciplinary segregation or lock-down; the loss of recreation and commissary privileges; and the imposition of cell restrictions,

DANIEL COKER HORTON & BELL, P.A.

March 31, 2017
Page 5

does not implicate a liberty interest because those punishments do not represent 'the type of atypical, significant deprivation in which a State might conceivably create a liberty interest'"); *Sharp v. Anderson*, 220 F.3d 587, at *3 (5th Cir. 2000) (inmate's claim that he was kept in administrative segregation for 112 days after he was found not guilty of a disciplinary charge did not implicate the protections of the due process clause).

Solitary confinement is typically viewed as an ordinary, expected, and permissible incident of prison life. *Bailey v. Fisher*, 2016 U.S. App. LEXIS 8455, *4 (5th Cir. 2016). However, the Fifth Circuit has held that solitary confinement can be used in a way that "imposes atypical and significant hardship" under certain circumstances. *Id.*, at 5 (discussing *Wilkinson v. Austin*, 545 U.S. 209 (2005), and *Wilkerson v. Goodwin*, 774 F.3d 845, 855-57 (5th Cir. 2014) (holding plaintiff's assignment to solitary confinement for 39 years under restrictive conditions constituted atypical and significant hardship)). The Fifth Circuit has held that "both the severity of the restrictive conditions and their duration are key factors in determining whether an inmate has a liberty interest in his custodial classification." *Bailey*, 2016 U.S. App. LEXIS 8455, at 9-10, citing *Wilkerson*, 774 F.3d at 854. In essence, courts employ a sliding scale, taking into account how bad the conditions are *and* how long they last. *Id*. As noted by the district court, the Fifth Circuit has recently suggested that "**two and a half years of segregation is a threshold of sorts for atypicality**." *Id.*, citing *Wilkerson*, 774 f.3d at 855). The *Bailey* court, citing *Wilkerson*, noted that "18-19 months of segregation even under the most isolated of conditions may not implicate a liberty interest." *Id*.

In the present action, Kelley was housed in isolated conditions at EMCF for less than four months following his RVR conviction for escaping his housing unit. ROA.790-810. EMCF Case Manager Sharon Williams submitted a sworn affidavit detailing Plaintiff's housing assignments from the date he was charged with escaping his unit, December 17, 2013, to the present, as well as the restrictions and privileges for each unit where he was housed:

> According to Offender Kelley's housing history, he was moved from Unit 1-A to a cell in Intake on December 17, 2013. His incident history indicates this was the same day he was accused of escaping his housing unit to retrieve contraband. The Intake area near the front of the prison has six holding cells occasionally used to temporarily house offenders when there is no bed space in segregation. Offenders housed in Intake are not allowed out of their cells for recreation. They are given an opportunity to shower three times per week. They have no property restrictions and can bring their personal property with them, unless they are on suicide watch. They are also allowed to purchase hygiene items from the commissary. The Intake area does not have a television. Phones are made available three times per week for offenders who have an account set up to place calls. If an inmate was participating in a certain class or program prior to being moved to Intake, they could still receive their course work but it would have to be completed in their cell.

DANIEL COKER HORTON & BELL, P.A.

March 31, 2017
Page 6

On or about December 31, 2013, Offender Kelley was moved from Intake to Unit 6-D, which is the administrative segregation unit at EMCF. Inmates on this unit are generally locked down 23 hours per day. They are permitted one hour of outdoor recreation each day, weather permitting. They are also provided an opportunity to shower for 30 minutes three times per week. Personal property is limited to a sleeping mat, three sets of clothes, reading materials, up to six inches of legal paperwork, and hygiene items. There is no television on this unit. Inmates are allowed to purchase hygiene items from the commissary. Inmates in administrative segregation do not enjoy visitation privileges. However, wall phones are made available three times per week for inmates who have accounts set up to place calls. If an inmate was participating in a certain class or program prior to being sent to administrative segregation, they could still receive their course work but it would have to be completed in their cell.

On or about January 3, 2014, Offender Kelley was moved to a cell in the Intake area.

On or about January 17, 2014, Offender Kelley was moved back to a cell on Unit 6-D.

On or about February 10, 2014, Offender Kelley was moved to a cell on Unit 5-A. Unit 5 at EMCF is a long-term segregation unit with a step-down program that allows offenders to progress toward a return to open population based on their good behavior. Unit 5-A is an orientation zone, where offenders are introduced to program rules and are educated on behavioral requirements for being released from long-term segregation. Offenders on Unit 5-A generally are locked down for 23 hours per day. They are permitted one hour of outdoor recreation per day, weather permitting. They are also provided an opportunity to shower for 30 minutes three times per week. Personal property is limited to a sleeping mat, three sets of clothes, reading materials, up to six inches of legal paperwork, and hygiene items. There is a television in the day room offenders can watch through the window in their cell doors. Offenders are permitted to purchase hygiene items from the commissary. Non-contact visits are allowed once per month. Phones are also made available three days per week for those offenders who have an account set up to place calls. Offenders are also given educational and mental health materials to work through in their cells.

On or about April 22, 2014, Offender Kelley was "promoted" to Unit 5-C. Although this zone is still part of the long-term segregation unit, offenders on

Daniel Coker Horton & Bell, p.a.

March 31, 2017
Page 7

this zone enjoy significantly greater privileges than those offenders housed on Unit 5-A or Unit 5-B.  Offenders on Unit 5-C generally are permitted to come out of their cells from the time official count clears around 6 a.m. until dinner time around 5 p.m.  While they are out of their cells, offenders may watch television, play games, use the wall phones, and talk with one another in the day room, and they have access to the outdoor recreation yard where they can play basketball.  They are permitted to order items from the commissary once per week as long as they have no commissary restrictions for rule violations.  Non-contact visits are allowed once per month.  Offenders also have opportunities to participate in educational classes and programs through course work brought to them on the zone.

Offender Kelley remained housed on Unit 5-C until February 17, 2015, when he was transferred to the Madison County Detention Center pursuant to a court order.[4]

On or about November 20, 2015, Offender Kelley returned to EMCF and was placed back on Unit 5-C.

On or about January 7, 2016, Offender Kelley was "promoted" to Unit 5-D, which is for offenders preparing to move back into open population.  Offenders on Unit 5-D have the same restrictions and privileges as the offenders on 5-C, except offenders can earn quarterly contact visits based on their good behavior.

On or about January 13, 2016, Offender Kelley was moved to Unit 1-C.  Unit 1 is an open population unit that houses close custody offenders.  Offenders on Unit 1 generally are permitted to come out of their cells from the time official count clears around 6 a.m. until dinner time around 5 p.m.  While they are out of their cells, offenders may watch television, play games, use the wall phones, and talk with one another in the day room, and they have access to the outdoor recreation yard where they can play basketball.  They are permitted to order items from the commissary once per week as long as they have no commissary restrictions for rule violations.  Contact visits are allowed twice per month.  They are also allowed to attend educational classes and other programs outside the unit, and they are able to seek jobs within the prison.

---

[4] These Defendants do not possess any information regarding Plaintiff's conditions of confinement at the Madison County Detention Center.

DANIEL COKER HORTON & BELL, P.A.

March 31, 2017
Page 8

On or about January 31, 2016, Offender Kelley was moved to Unit 6-C. Units 6-A, 6-B, and 6-C are all open population zones for close custody offenders. Offenders housed on these three zones have the same privileges as those offenders housed on Unit 1.

On or about February 8, 2016, Offender Kelley was moved to Unit 6-D (administrative segregation) pending an investigation for protective custody. The restrictions on offenders housed on Unit 6-D are described above. This assignment to Unit 6-D was unrelated to Offender Kelley's prior RVR for escape.

On or about March 15, 2016, Offender Kelley was moved to Unit 6-B, an open population zone for close custody offenders as described above.

On or about March 23, 2016, Offender Kelley was moved back to Unit 6-D (administrative segregation) pending an investigation for fraudulent conduct. This assignment to Unit 6-D was unrelated to Offender Kelley's prior RVR for escape.

On or about May 17, 2016, Offender Kelley was moved to Unit 1-B, an open population unit for close custody offenders with privileges as described above for Unit 1.

On or about May 25, 2016, Offender Kelley was moved to Unit 2-C, which is a pre-release open population zone for medium custody offenders. Offenders on Unit 2-C have the same privileges as offenders housed on Unit 1.

As of this date, Offender Kelley remains housed on Unit 2-C at EMCF.

ROA.790-810. According to MDOC's inmate database, Kelley is still housed on Unit 2 at EMCF in open population.[5]

The district court properly noted that Kelley was confined to solitary confinement-type conditions for only three months and 22 days following his RVR conviction for escaping his housing unit. Once he was moved to Unit 5-C on April 22, 2014, he enjoyed many of the same privileges as offenders housed in open population, including spending most of the day out of his cell and free access to recreation, showers, phones, and visiting with other inmates. Kelley's conditions of confinement following April 22, 2014 bear no resemblance whatsoever to the isolated and restrictive

_____

[5] https://www.ms.gov/mdoc/inmate/Search/GetDetails/L2563

DANIEL COKER HORTON & BELL, P.A.

March 31, 2017
Page 9

conditions described in *Wilkerson* and *Bailey*.

The district court properly held that Kelley's temporary assignment to solitary confinement after his RVR conviction for escape falls far short of the atypicality threshold recently established by the Fifth Circuit in *Bailey*. It was an ordinary, expected, and permissible incident of prison life that does not implicate any constitutional due process concerns. Accordingly, there are no genuine issues of material fact, and Kelley's due process claims against these Defendants regarding his RVR conviction should be dismissed as a matter of law.

### B.  Kelley's RVR conviction was supported by sufficient evidence

Even if Kelley could show that he had some sort of protected liberty interest as it pertains to his housing assignment, he still cannot establish that the investigation or adjudication of his RVR for escaping his housing unit violated his due process rights. As long as there is "some evidence" in the record to support the disciplinary decision, due process requirements have been met. *Morgan v. Quarterman*, 570 F.3d 663, 668 (5th Cir. 2009) (citing *Superintendent, Mass. Correctional Inst. v. Hill*, 472 U.S. 445, 455 (1985). Federal courts do not "second-guess" the findings and determinations of prison disciplinary committees, nor does the Constitution demand "error-free decision making ." *Hargro v. Byrd*, 2009 U.S. Dist. LEXIS 89003, 38 (S.D. Miss. Sept. 28, 2009). The courts are not intended to retry every prison disciplinary dispute; rather, the court may act only where arbitrary or capricious action is shown. *Reeves v. Pettcox*, 19 F.3d 1060, 1062 (5th Cir. 1994). Prison disciplinary decisions will be overturned only where there is no evidence whatsoever to support the prison official's finding. *Id*.

In this case, Kelley received a disciplinary hearing on the RVR in question, he was given proper notice of the same, and he was given an opportunity to present testimony in his defense. There also was sufficient evidence to support Lt. Jones' guilty finding, including the statements of other prisoners who implicated Kelley in the escape from their housing unit and Kelley's own admissions to investigators regarding his role in the incident. While Kelley argues that he was not allowed to call Sgt. Dean or Sgt. Traylor as witnesses, he failed to list any witnesses for the hearing when he signed for receipt of his RVR, and he has failed to present anything more than conjecture as to what their testimony would have been. In fact, investigators determined that Sgt. Dean and Sgt. Traylor had failed to inspect each cell during their count procedures and security checks during the time period in which the escape incident occurred, and that they would have discovered Kelley and the other inmates missing if they had carried out their duties properly. Kelley offers nothing more than his own self-serving statements to support his denial of the allegations against him.

The district court properly held that despite Kelley's denial of guilt and his dissatisfaction with the process, there was sufficient evidence to support the hearing officer's decision and that due process requirements were met.

DANIEL COKER HORTON & BELL, P.A.

March 31, 2017
Page 10

Additionally, to the extent Kelley asserts that the RVR he received and/or his disciplinary hearing may have contained administrative errors under MDOC policy – which is denied – he has failed to raise a constitutional claim.  *See Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (noting that a "prison official's failure to follow the prison's own policies, procedures or regulations does not constitute a violation of due process, if constitutional minima are nevertheless met").

Further, although Kelley argues in his appellate brief that the district court did not provide him with extensive additional discovery that he requested regarding the allegations in his RVR and conviction on the same, none of the materials sought, if they even exist, are relevant to any of the Section 1983 claims asserted against these Defendants.[6] As discussed *supra*, the federal courts were not intended for prisoners to re-litigate their prison disciplinary hearings.

The district court's determination that Kelley cannot establish a constitutional claim regarding his rule violation conviction was proper and should be affirmed.

### C.     Kelley cannot recover monetary damages as a result of any claim pertaining to his RVR conviction

Additionally, to the extent Kelley seeks monetary damages based on his RVR conviction, his claims are barred by the *Heck* doctrine. A Section 1983 damages claim that calls into question the lawfulness of conviction or confinement or otherwise demonstrates the invalidity of the conviction or confinement is not cognizable under Section 1983 until such time as the plaintiff is able to prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. *Heck v. Humphrey*, 512 U.S. 477, 487-88 (1994). A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. *Id*.

Warden Buscher denied Kelley's administrative appeal of his RVR "conviction" through the ARP process, and Plaintiff has failed to present any evidence that the conviction has been

---

[6] Kelley requested a copy of the surveillance video referenced in Investigator Alexander's report, but Kelley has admitted that the hearing officer did not personally review the video in reaching her decision and instead relied on the investigator's description of the same.  Also, despite Kelley's request for written witness statements, the investigator's report specifically states that he conducted "an interview" of each inmate but that there were no written statements. Kelley also requested "photo arrays" of inmates entering or exiting the Unit 1-A ventilation duct, but no such photos are referenced in the investigation report, nor did Lt. Jones indicate she relied on any such photos in reaching her decision at the disciplinary hearing.  Kelley further requested the audio recording of his disciplinary hearing, but Defendants are not aware of the existence of any such recording.

DANIEL COKER HORTON & BELL, P.A.

March 31, 2017
Page 11

invalidated. A favorable judgment on Plaintiff's civil claims for due process violations and monetary damages would necessarily imply the invalidity of his RVR conviction. Accordingly, Plaintiff's claims for alleged due process violations are barred by *Heck* and should be dismissed for this additional reason. *See Simpson v. Berry*, 2013 U.S. Dist. LEXIS 36807, 10 (S.D. Miss. Feb. 19, 2013).

**D.    Kelley cannot establish a constitutional claim regarding Warden Buscher's response to his disciplinary appeal**

Kelley claims that Warden Buscher violated his rights to due process by denying his administrative appeal of his RVR conviction because the RVR was procedurally defective and because Lt. Jones did not follow proper procedure at his disciplinary hearing. Warden Buscher denied his appeal, finding that due process requirements had been met and that Plaintiff had failed to present any new evidence that would affect his conviction.

A prisoner has no constitutional right to a grievance procedure, and he has no due process liberty interest in having his grievance resolved to his satisfaction. *Geiger*, 404 F.3d at 373-74; *Adams*, 2012 U.S. Dist. LEXIS 53542, 11. In *Geiger*, the Fifth Circuit held that a prisoner's alleged due process violation arising from the alleged failure to investigate his grievances is based on a "legally nonexistent interest" and "is indisputably meritless." *Id*., at 374.

Because Kelley has no federally-protected liberty interest in grievance procedures or having his grievances resolved to his satisfaction, his claims against Warden Buscher in that regard are based on a legally nonexistent interest and are indisputably without merit. Accordingly, Kelley has failed to state a claim against Warden Buscher upon which relief may be granted, and Kelley's claims against him in that regard should be dismissed with prejudice.

**II.    Plaintiff has failed to establish an Eighth Amendment violation regarding his living conditions in segregation**

Kelley further claims that his living conditions in administrative segregation – specifically in Unit 6-D and Unit 5-A – constituted cruel an unusual punishment in violation of his rights under the Eighth Amendment. As discussed *supra*, Kelley was housed in various cells on these units from December 31, 2013 until April 22, 2017.

Under the Eighth Amendment, prison officials are required to provide humane conditions of confinement ensuring that inmates receive adequate food, clothing, shelter, and medical care, and they must take reasonable measures to guarantee the safety of inmates. *See Farmer v. Brennan*, 511 U.S. 825 (1994). The deprivation alleged must be so serious as to "deprive prisoners of the minimal civilized measures of life's necessities," as when it denies the prisoner some basic human need. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). To successfully prove a claim for unconstitutional

DANIEL COKER HORTON & BELL, P.A.

March 31, 2017
Page 12

conditions of confinement, a prisoner must demonstrate that the prison officials' conduct resulted in him being incarcerated under "conditions which [posed] an unreasonable risk of damage to [the prisoner's] future health." *Herman v. Holliday*, 238 F.3d 660, 664 (5ᵗʰ Cir. 2001). This "risk must be of such level that today's society would not tolerate it." *Id*. The prisoner must plead facts which establish: (1) objectively, that the deprivations are sufficiently serious; and (2) subjectively, that the defendant prison officials knew of the deprivations but nevertheless have shown a "deliberate indifference" to the prisoner's health or safety. *Id*.; *see also Davis v. Scott*, 157 F.3d 1003, 1005 (5ᵗʰ Cir. 1998).

A prisoner must show that the defendant prison official acted with "deliberate indifference," which the U.S. Supreme Court has defined as knowing of and disregarding "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence is insufficient to satisfy the "deliberate indifference" standard. *Wilson*, 501 U.S. at 303.

The district court properly held that Plaintiff has failed to present any evidence that any of these Defendants were attempting to punish Kelley by housing him in a cell with deficient lighting or other less than desirable conditions, or that they were even personally aware of such conditions. Further, the alleged conditions described by Plaintiff in this case fall far short of him being denied the "minimal civilized measure of life's necessities," as required to establish an Eighth Amendment violation.

As for Kelley's claim that he had no working light in his cell, he has not alleged that he had *no* source of light in his cell, which would have included light from the day room and light from the outside window.  He also has not alleged that he was unable to read or draft legal documents, such that his access to the courts was impeded – he only alleges the insufficient lighting made reading more difficult.  He also has failed to demonstrate that Warden Buscher was aware of any problems with the lighting in his cell and chose to ignore it. Additionally, Kelley has failed to present any evidence whatsoever to show that he suffered any physical injury as a result of having insufficient lighting in his cell for approximately three months. Although Kelley claims he has experienced vision problems, and that he believes these problems are related to the time period he did not have a working light, he has failed to present any evidence that his vision problems were caused by the deficient lighting in his cell. Plaintiff's medical records indicate that during a routine optometry exam on August 28, 2014 – more than five months after his light was fixed – he was diagnosed with hyperopia/presbyopia (farsightedness). As discussed *supra*, this type of condition is caused by genetics and/or aging, and it usually becomes noticeable around age 40. Plaintiff was almost 41 at the time of his diagnosis. Kelley's allegations that his eye sight was affected by the lighting in his cell is nothing more than speculation and conjecture. Because Kelley has failed to establish that he suffered any physical injury as a result of the deficient lighting in his cell, he is prohibited from recovering monetary damages as to his claim in that regard. *See* 42 U.S.C. § 1997e(e) (prohibiting

Daniel Coker Horton & Bell, p.a.

March 31, 2017
Page 13

the recovery of mental or emotional damages absent a showing of physical injury).

As for Kelley's claim that he had no heat in his cell during the three months in question, he has failed to provide any specifics as to what temperatures were involved, does not deny that he was provided sufficient clothing and blankets, and has not shown how his cell was different from any other cell on his housing unit. The Eighth Amendment does not require that inmates be housed in comfortable prisons, and what may have been cold to Kelley may have been perceived as pleasant to others. Kelley also has failed to demonstrate that Warden Buscher was personally responsible for him not having heat in his cell. Regardless, Kelley has not identified any physical injury he sustained as a result of not having heat in his cell during the time period in question. Thus, his claim for monetary damages in that regard is barred by the PLRA.

Kelley's assertion that he was provided inadequate access to showers and recreation during the time period in question also fails to establish that he was deprived of "the minimal civilized measures of life's necessities," nor has he demonstrated Warden Buscher's involvement with the same. There was nothing preventing Kelley from washing up using the sink in his cell or from doing exercises in his cell. Regardless, because Kelley cannot show that he suffered any physical injury due to allegedly inadequate showers or recreation, his claim for monetary damages in that regard are barred by the PLRA.

To the extent Kelley claims he was subjected to unsanitary conditions on his housing unit during the time period in question, he again has failed to show that the conditions as alleged deprived him of the minimal civilized measures of life's necessities or that Warden Buscher was personally involved in the same. Regardless, Kelley has failed to present evidence that he suffered any physical injury as a result of the allegedly unsanitary conditions on his unit, and his claim for monetary damages in that regard are barred by the PLRA. *See* 42 U.S.C. § 1997e(e).

### Conclusion

The district court correctly held that Kelley has failed to demonstrate a genuine issue of material fact as to his claim that Defendants violated his due process rights through his rule violation conviction for escaping his housing unit or the punishment he received for the same. The district court also properly determined that Kelley has failed to establish a constitutional claim regarding his living conditions while temporarily housed in segregation. Accordingly, the district court's order granting Defendants' Motion for Summary Judgment should be affirmed.

Respectfully submitted, this the 31st day of March, 2017.

JERRY BUSCHER, JAMES ALEXANDER, AND
SIMONE JONES

D ANIEL  C OKER  H ORTON  &  B ELL ,  P.A.

March 31, 2017
Page 14

BY:    /s/  *Steven J. Griffin*
          OF COUNSEL

ROY A. SMITH, JR. - BAR # 7599
rsmith@danielcoker.com
STEVEN J. GRIFFIN - BAR # 103218
sgriffin@danielcoker.com
DANIEL COKER HORTON AND BELL, P.A.
4400 OLD CANTON ROAD, SUITE 400
POST OFFICE BOX 1084
JACKSON, MISSISSIPPI 39215-1084
TELEPHONE: (601) 969-7607
FACSIMILE: (601) 969-1116

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2017, I electronically filed the foregoing with the Clerk of

the Court using the ECF system, and I hereby certify that I have mailed by United States Postal

Service the document to the following non-ECF participants:

Daniel G. Kelley (MDOC #68043)
East Mississippi Correctional Facility
10641 Highway 80 West
Meridian, MS 39307

/s/  *Steven J. Griffin*

DANIEL COKER HORTON & BELL, P.A.

March 31, 2017
Page 15

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities have

an interest in the outcome of this case.  These representations are made in order that the judges of

this court may evaluate possible disqualification or recusal.

1.    Daniel G. Kelley, Plaintiff/Appellant;

2.    Jerry Buscher, Defendant/Appellee;

3.    James Alexander, Defendant/Appellee;

4.    Simone Jones, Defendant/Appellee;

5.    Management & Training Corporation, current or past employer of Defendants-Appellees Jerry Buscher, James Alexander, and Simone Jones;

6.    Mississippi Department of Corrections; and

7.    Steven J. Griffin, Counsel for Defendants-Appellees Frank Shaw, Derrick Smith, Michael Rice, Augustine Battle, Matthew Naidow, and Christopher Dykes.

Respectfully submitted, this the 31st day of March, 2017.

/s/   Steven J. Griffin
Counsel for Jerry Buscher, James Alexander and
Simone Jones

ROY A. SMITH, JR. - BAR # 7599
rsmith@danielcoker.com
STEVEN J. GRIFFIN - BAR # 103218
sgriffin@danielcoker.com
DANIEL COKER HORTON & BELL, P.A.
4400 OLD CANTON ROAD, SUITE 400
POST OFFICE BOX 1084
JACKSON, MISSISSIPPI 39215-1084
TELEPHONE: (601) 969-7607
FACSIMILE: (601) 969-1116